**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| GREGORY PROTZMAN, | CASE NO. 3:13-cv-02558-YK-GBC |
| Plaintiff, | (JUDGE KANE) |
| v. | (MAGISTRATE JUDGE COHN) |
| CAROLYN W. COLVIN, ACTING COMMISSIONER OF SOCIAL SECURITY, | REPORT AND RECOMMENDATION TO VACATE THE DECISION OF THE COMMISSIONER AND REMAND FOR FURTHER PROCEEDINGS |
| Defendant. | |
| | Docs. 1, 6, 7, 8, 12, 13 |

## REPORT AND RECOMMENDATION

### I.    Introduction

The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying the application of Plaintiff Gregory Protzman for disability insurance benefits ("DIB") under the Social Security Act, 42 U.S.C. §§401-433, 1382-1383 (the "Act"). Plaintiff asserts that the ALJ erred in evaluating his mental impairments. Plaintiff was injured at his job as a high school principal in 2006. He developed reflex sympathetic dystrophy ("RSD"), which caused pain and a "burning" sensation in his legs, and other physical impairments. He reported that he had been athletic and active prior to his injury, but his physical pain precluded him from performing these activities and he

became obese. Conservative treatment failed, and he had to undergo spinal surgery to have a spinal stimulator implanted. He lost his job and pension, entered bankruptcy, and went through a divorce from his wife. He began reporting depressive, anxious, and post-traumatic stress disorder ("PTSD") symptoms from these events, along with abuse he suffered as a child. Plaintiff was treated by a psychiatrist and a therapist during the relevant period, and was on multiple psychotropic medications. He reported that these medications, along with his pain medications, impacted his mental functioning. He also reported memory problems from traumatic brain injuries suffered while playing contact sports. Plaintiff reported difficulties getting along with family, paramours, students he mentored and their families, and supervisors. He was admitted to the hospital for an overdose of medication. He also checked himself into three different emergency rooms in early February of 2012 after having traumatic triggers of past sexual abuse as a child, which he dealt with by slamming his hand with a hammer. He frequently carried the diagnoses of depression, anxiety, and PTSD throughout the relevant period and was assessed global assessment of functioning ("GAF") scores between 41 and 60.

In determining Plaintiff's functional limitations, the ALJ discussed only Plaintiff's diagnosis of depression and his "normal examination findings." The ALJ did not mention Plaintiff's overdose, suicidal thoughts, or hospitalization after

harming himself with a hammer. The ALJ factually mischaracterized the record and concluded that Plaintiff had never visited the emergency room for mental problems and never reported problems with interacting with others or daily activities. Despite concluding that Plaintiff had moderate difficulties in concentration, persistence, and pace, the ALJ found that Plaintiff's mental impairments required only a limitation to semi-skilled work and a restriction from "constant" interaction with coworkers, supervisors, or the public. This violates Third Circuit precedent. *Ramirez v. Barnhart*, 372 F.3d 546 (3d Cir. 2004). The ALJ also rejected the opinion of the state agency psychologist that Plaintiff should be limited to simple, repetitive work without explanation. This also violates Third Circuit precedent. *Adorno v. Shalala*, 40 F.3d 43 (3d Cir. 1994). The combination of factual and legal errors with regard to Plaintiff's mental impairments precludes meaningful review. As a result, the Court recommends that Plaintiff's appeal be granted, the decision of the Commissioner be vacated, and the matter be remanded for further proceedings.

## II.    Procedural Background

On January 31, 2011, Plaintiff protectively filed an application for DIB under Title II of the Act. (Tr. 177-83). On June 13, 2011, the Bureau of Disability Determination denied this application (Tr. 102, 141-45), and Plaintiff filed a request for a hearing on July 11 2011.  (Tr. 147-48). On June 7, 2012, an ALJ held

a hearing at which Plaintiff—who was not represented by an attorney—and a vocational expert ("VE") appeared and testified. (Tr. 11-46). On August 2, 2012, the ALJ found that Plaintiff was not disabled and not entitled to benefits. (Tr. 122-38). On August 13, 2012, Plaintiff filed a request for review with the Appeals Council (Tr. 8-10), which the Appeals Council denied on August 20, 2013, thereby affirming the decision of the ALJ as the "final decision" of the Commissioner. (Tr. 1-7).

On October 14, 2013, Plaintiff filed the above-captioned action pursuant to 42 U.S.C. § 405(g) to appeal the decision of the Commissioner. (Doc. 1). On March 5, 2014, the Commissioner filed an answer and administrative transcript of proceedings. (Docs. 6, 7). On April 17, 2014, Plaintiff filed a brief in support of his appeal ("Pl. Brief"). (Doc. 8). On May 1, 2014, the Court referred this case to the undersigned Magistrate Judge. On June 18, 2014, Defendant filed a brief in response ("Def. Brief"). (Doc. 12). On July 2, 2014, Plaintiff filed a brief in reply. (Doc. 13). The matter is now ripe for review.

### III.    Standard of Review

When reviewing the denial of disability benefits, the Court must determine whether substantial evidence supports the denial. *Johnson v. Commissioner of Social Sec.*, 529 F.3d 198, 200 (3d Cir. 2008). Substantial evidence is a deferential standard of review. *See Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004).

Substantial evidence "does not mean a large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Substantial evidence is "less than a preponderance" and requires only "more than a mere scintilla." *Jesurum v. Sec'y of U.S. Dep't of Health & Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

## IV.    Sequential Evaluation Process

To receive disability or supplemental security benefits, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 1382c(a)(3)(A). The Act requires that a claimant for disability benefits show that he has a physical or mental impairment of such a severity that:

> He is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A); 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step evaluation process to determine if a person is eligible for disability benefits. *See* 20 C.F.R. § 404.1520; *see also Plummer v. Apfel*, 186 F.3d 422, 428 (3d Cir. 1999). If the Commissioner finds that a Plaintiff is disabled or not disabled at any point in the sequence, review does not proceed. *See* 20 C.F.R. § 404.1520.   The Commissioner must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment from 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listing"); (4) whether the claimant's impairment prevents the claimant from doing past relevant work; and (5) whether the claimant's impairment prevents the claimant from doing any other work. *See* 20 C.F.R. §§ 404.1520, 416.920. Before moving on to step four in this process, the ALJ must also determine Plaintiff's residual functional capacity ("RFC").   20 C.F.R. §§ 404.1520(e), 416.920(e).

The disability determination involves shifting burdens of proof. The claimant bears the burden of proof at steps one through four.  If the claimant satisfies this burden, then the Commissioner must show at step five that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir.

1993). The ultimate burden of proving disability within the meaning of the Act lies with the claimant. *See* 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 416.912(a).

## V. Relevant Facts in the Record

Plaintiff was born on November 13, 1973 and was classified by the regulations as a younger individual through the date of the ALJ decision. 20 C.F.R. § 404.1563. (Tr. 132). Plaintiff has a college and a master's degree and past relevant work as a principal, assistant principal, and fitness teacher. (Tr. 41).

## A. Physical Impairments

On April 9, 2010, Plaintiff was evaluated by pain specialist Dr. Ibrahim Elsamanoudi, M.D. (Tr. 400). Dr. Elsamanoudi noted that Plaintiff had been injured in 2006 and subsequently developed symptoms of complex regional pain syndrome in his right leg that spread to his left leg. (Tr. 400). Plaintiff "failed all treatment modalities and underwent an implant of a spinal cord stimulator." (Tr. 400). Plaintiff reported using the stimulator periodically for "some pain relief." (Tr. 400). He was also complaining of a "burning" sensation and sensitivity to touch in his legs. (Tr. 400). Plaintiff rated his pain as a seven out of ten and reported that it was improving due to warmer weather. (Tr. 400). Plaintiff was also treating his pain with Lortab and Flexeril, and was treating his mental impairments with Ambien, Cymbalta, lorazepam, and Elavil from his psychiatrist. (Tr. 400). He ambulated with a "slight antalgic gait." (Tr. 400). He had "functional range of

motion of his hips, knees, and ankles bilaterally." (Tr. 400). His leg strength was "5/5 and symmetric." (Tr. 400). He had "areas of hyperesthesia[1] especially over the thighs bilaterally and the right knee." (Tr. 400). Plaintiff's medications were continued except for his Lortab, which was temporarily increased until he had a painful tooth extracted. (Tr. 400). At a follow-up on June 11, 2010, Plaintiff had a normal gait, was increasing his activity, and rated his pain as a two out of ten. (Tr. 396). In September and December of 2010, Plaintiff continued reporting pain and burning in his legs to Dr. Elsamanoudi, and examination findings included sensitivity and discoloration on his legs. (Tr. 394-95).

Plaintiff also began to complain of shoulder pain. (Tr. 299). On December 9, 2010, an X-ray of Plaintiff's shoulder indicated no "acute osseous abnormalities." (Tr. 299). On December 15, 2010, a CT scan of Plaintiff's shoulder indicated a labral tear. (Tr. 298). Plaintiff was scheduled for surgery on his shoulder. (Tr. 319).

On December 12, 2010, Plaintiff was evaluated by Dr. Dennis Probst, D.O. for one day of profound dizziness. (Tr. 318). He denied headaches and weakness and reported that his dizziness was worse with changing positions. (Tr. 318). Plaintiff's "balance [was] off when he [stood] from a seating position." (Tr. 318).

---

[1] Hyperesthesia is "[e]xcessive sensitivity of the skin to various stimuli, as pain, temperature, etc." 3-H Attorneys' Dictionary of Medicine H-58485.

Plaintiff was prescribed antivert for dizziness and instructed to follow-up in five days if there was no improvement. (Tr. 318).

On January 19, 2011, Plaintiff underwent surgery for a labral tear in his shoulder. (Tr. 301). On March 4, 2011, Plaintiff followed-up with Dr. Elsamanoudi. (Tr. 393). Plaintiff continued to complain of a burning sensation, sensitivity to touch, and color changes in his legs. (Tr. 393). He rated his pain as a two or three out of ten in the lower extremities and a five out of ten in the shoulder. (Tr. 393). On examination he had sensitivity, dysesthesia,[2] and discoloration on his legs. (Tr. 393). Later that day, Plaintiff followed-up with his shoulder surgeon, Dr. John B. O'Donnell, M.D. (Tr. 309). Plaintiff was "doing well." (Tr. 309). He had "painless neck motion" with no instability. (Tr. 309). He had "excellent strength of his rotator cuff muscles" and a negative impingement sign. (Tr. 309). He was scheduled to start formal physical therapy. (Tr. 309).

On March 14, 2011, Plaintiff followed-up with Dr. Probst for a "feeling of off balance." (Tr. 316). Plaintiff reported that he does not feel dizzy, just off-balance. (Tr. 316). Plaintiff reported "these symptoms have been progressive over several weeks to months." (Tr. 316). On examination, Plaintiff had a "slight horizontal nystagmus to the left" and positive Romberg sign. (Tr. 316). Plaintiff was referred to a neurologist. (Tr. 316).

---

[2] Dysesthesia is [i]mpairment of one of the senses, especially the sense of touch." 2-D Attorneys' Dictionary of Medicine D-37832.

On April 14, 2011, Plaintiff had a consultative examination with state agency physician Dr. Craig Nielsen, M.D. (Tr. 325). Dr. Nielsen noted that "[h]istory was a bit difficult to get from the patient, as he was a bit wandering and it was difficult to put a clear story together." (Tr. 325). Dr. Nielsen noted that Plaintiff "has a really odd affect" and will intermittently "have a glaring wide-open eyed look." (Tr. 328). He had pressured speech and never smiled. (Tr. 328). His "[a]rticulation of speech [was] a bit difficult to understand at times, particularly when he talk[ed] very rapidly." (Tr. 328). Plaintiff's physical examination was largely normal. (Tr. 326-29). Dr. Nielsen observed Plaintiff descending the stairs normally as he left the office. (Tr. 330). Dr. Nielsen opined that Plaintiff could lift and carry up to twenty five pounds occasionally, had no limitation in sitting, standing, walking, pushing, pulling, postural activities, or other physical functions. (Tr. 332). He opined that Plaintiff should avoid working around moving machinery until his shoulder was fully recovered. (Tr. 332).

On May 6, 2011, Plaintiff followed-up with Dr. Elsamanoudi. (Tr. 392). He reported that his shoulder was "doing much better and he has very little pain in his shoulder at this point." (Tr. 392). Plaintiff had discontinued his therapy for his shoulder and was "planning on seeing the surgeon today to be released back to full activities." (Tr. 392).   He rated his pain as a two or three out of ten in the lower extremities with pain medication. (Tr. 392). On examination he had sensitivity,

dysesthesia, and discoloration on his legs. (Tr. 392). Plaintiff's medications were continued. (Tr. 392).

On July 5, 2011, Plaintiff presented to the emergency room at Lock Haven Hospital complaining of ingesting a known substance after being given the wrong prescriptions by the pharmacy. (Tr. 356).  Plaintiff's physical examination was normal. (Tr. 357). The Poison Control Center indicated that there would be "no problem" with Plaintiff ingesting one dose of the medicine. (Tr. 357). Plaintiff's pain improved, he was discharged home "ambulatory without incident" and instructed to follow-up with Dr. Probst. (Tr. 355).

On July 29, 2011, Plaintiff followed-up with Dr. Elsamanoudi. (Tr. 391). He reported increasing pain in his lower back.  (Tr. 391). He rated his pain as an eight out of ten in the back and five out of ten in the lower extremities. (Tr. 391). On examination he had sensitivity, dysesthesia,[3] and discoloration on his legs. (Tr. 391). Plaintiff was unable to obtain a CT scan of his lower back because his insurance would not cover the scan. (Tr. 391). He reported that "Lortab is not providing any relief for him," and Dr. Elsamanoudi switched him to Oxycodone. (Tr. 391). On September 8, 2011, a CT scan of Plaintiff's lumbar spine indicated only mild abnormalities and mild to moderate facet osteoarthropathy. (Tr. 403).

---

[3] Dysesthesia is [i]mpairment of one of the senses, especially the sense of touch." 2-D Attorneys' Dictionary of Medicine D-37832.

On January 1, 2012, Plaintiff presented to the emergency room at Lock Haven Hospital after helping a "police officer in getting a deer out of a parking lot" and "taking it down and hog tying it." (Tr. 410). He "denie[d] any specific injury from the incident, but states it aggravated his chronic RSD" and "put [him] into med mode." (Tr. 410). He was complaining of "burning" in his right knee and left thigh. (Tr. 410).He reported that his pain was a ten on a ten point scale. (Tr. 412). Examination of his lower extremities was normal. (Tr. 411). Plaintiff was given intravenous toradol, then discharged home in improved condition and instructed to follow-up with Dr. Probst. (Tr. 411-12).

On May 8, 2012, Plaintiff was evaluated by a neurologist, Dr. Kristina Duffy. (Tr. 466). Plaintiff was following-up for "several years of gait unsteadiness, worsening short-term memory," RSD, and lightheadedness and tunnel vision when going from seated to standing. (Tr. 466). Plaintiff's gait was normal, he had no spine tenderness, and his balance and coordination were intact. (Tr. 467-68). Plaintiff's motor strength and reflexes were grossly intact. (Tr. 467). His fine motor skills were normal. (Tr. 468). His deep tendon reflexes were symmetrically decreased. (Tr. 468). Plaintiff had a flat affect. (Tr. 468). He had "some inconsistencies in his exam-could be secondary to chronic morphine use," as he "almost falls when standing for balance testing, no issues when stands to leave exam room." (Tr. 468). Plaintiff declined physical therapy because he felt his

insurance would not cover it and Dr. Duffy recommended that he "minimize opiate use." (Tr. 468). On May 10, 2012, weightbearing X-rays of the right and knees were "normal." (Tr. 433).

## B. Mental Impairments

From 2006 to 2012, Plaintiff was treated at Berkshire Psychiatric (Tr. 365-70, 389-90). In 2006, his GAF was 70. (Tr. 387). On May 1, 2010 Plaintiff indicated he was "more up" than he had been in "awhile", and he had "no major stress" (Tr. 369). In August of 2010, Plaintiff reported that he tends to "isolate." (Tr. 367). On November 16, 2010 and February 28, 2011, Plaintiff was assessed to have a GAF of 41-50.  (Tr. 365-66). In November 2010, Plaintiff was having "very high anxiety" and Lexapro was not helping. (Tr. 366). Plaintiff's sleep was poor, but he was overall "stable." (Tr. 366). Plaintiff reported nightmares about the school where his trauma happened. (Tr. 366). In February of 2011, Plaintiff's affect was anxious and his mood was dysphoric. (Tr. 365).

Plaintiff was also treated at Universal Community Behavioral Health ("Universal") from March 3, 2011 to May 15, 2012. (Tr. 470-550). Dr. Probst referred him to Universal, and Plaintiff contacted them on February 16, 2011 to schedule an assessment. (Tr.537, 546). Plaintiff was complaining of memory problems and PTSD from a hostile work environment while he was a principal at a high school. (Tr. 546). His assessment was scheduled for March 3, 2011. (Tr. 544).

At his assessment, Plaintiff reported having suicidal thoughts three years earlier. (Tr. 533). He denied psychotic and manic symptoms. (Tr. 534). He reported multiple depressive symptoms, including depressed mood, diminished interest or pleasure in activities, insomnia, psychomotor retardation, fatigue or loss of energy, feelings of worthless or excessive or inappropriate guilt, and a diminished ability to think or concentrate or indecisiveness. (Tr. 534). He denied symptoms of anxiety and obsessive compulsive disorder. (Tr. 535). Plaintiff reported symptoms of PTSD, specifically nightmares three to four times per week, sleep problems, a sense of a foreshortened future, and intrusive thoughts. (Tr. 535). Plaintiff attributed these symptoms to a hostile work environment and problems with a "superintendent who fired nine administrators in one year." (Tr. 535). Plaintiff "denie[d]" having difficulty "managing [his] daily activities at home" and "making friends or maintaining healthy relationships." (Tr. 538). He indicated that he "learn[s] best" by "reading" and "verbal" methods. (Tr. 538).

On mental status examination, Plaintiff was relaxed, clean and casually groomed, cooperative, and oriented. (Tr. 540). His eye contact, immediate recall, reliability, memory, abstract reasoning, insight/judgment, impulse control, and concentration were all "good." (Tr. 540). He denied hallucinations and had "clear or appropriate" perception. (Tr. 540). His speech and thought process were normal and his thought content was appropriate. (Tr. 540). His psychomotor behavior and

affect were appropriate. (Tr. 541). He was diagnosed with major depressive disorder, recurrent, severe without psychosis, and PTSD. (Tr. 541). He was assessed a GAF of 50. (Tr. 541).   Plaintiff was referred to outpatient therapy starting the next week for PTSD and depression symptoms. (Tr. 548). Plaintiff had therapy once or twice a month through May 15, 2012. (Tr. 489). From March through November of 2011, Plaintiff attended thirteen appointments, with only two appointments that he cancelled ahead of time. (Tr. 489). He did not show up for his appointment in December of 2011. (Tr. 489). From January of 2012 through May of 2012, he attended four appointments, cancelled four appointments, and did not show up for two appointments. (Tr. 488). Plaintiff was discharged on May 7, 2012, due to having "no insurance/lack of funds," although he had one final visit on May 15, 2012. (Tr. 490-91).

On April 13, 2011, Plaintiff reported to his counselor at Universal that he had "detailed involvement with Lock Haven University fraternity volunteer." (Tr. 522). Plaintiff had to contact one of the fraternity member's parents after the fraternity member was incarcerated, released, and fell back into trouble again. (Tr. 522). Plaintiff had "regained confidence" through his encounters with a fraternity member "who tried to frame him." (Tr. 522). On April 27, 2011, Plaintiff reported a "down swing" after his mortgage company was "badgering" him and the parents of one of the college students threatened to sue him for his involvement with the

student's problems. (Tr. 521). On May 25, 2011, Plaintiff reported "being down (cycling)" for four to five days and isolated. (Tr. 519). He also reported "low self-worth" and "very negative thinking patterns." (Tr. 519). On June 8, 2011, Plaintiff reported feeling "mentally exhausted" and hopeless about the future given the "reality of a future being disabled/traumatic brain damage…from all years of contact sports." (Tr. 518).

On May 10, 2011 Plaintiff was evaluated by Dr. Rafal Marek Smigrodzki, M.D., for memory loss. (Tr. 340). Plaintiff denied change in appetite, decreased activity, generalized weakness, malaise, weight gain, and irritability. (Tr. 338). On examination, Plaintiff's memory, gait, coordination, and balance were intact; his reflexes were normal; and he had normal range of motion in all four extremities (Tr. 340). He had "no sensory loss" and "no motor weakness." (Tr. 340). Plaintiff had "mild complaints of memory problems, most likely a combination of late effects of multiple head injuries, as well as anxiety due to patient's psychiatric problems. Suggested to cut back on benzodiazepines." (Tr. 340). Plaintiff had a "recent CT head, normal." (Tr. 340). No further workup was needed. (Tr. 340). On June 1, 2011, a CT scan of the brain was normal. (Tr. 342).

On June 8, 2011, Plaintiff's treatment plan at Universal was updated. (Tr. 529). Plaintiff had four goals: (1) "address and resolve the numerous losses in past several years and again return to some sense of normalcy;" (2) work on/process the

root origins behind the identity issues of self-blame/inappropriate guilt and the compulsive, unhealthy drive to perform;" (3) "pursue a 'new normal' lifestyle in order to create a purposeful, meaningful role in life;" (4) "assess the need for a relationship with a significant other and find the means/resources to work towards that goal." (Tr. 529). Plaintiff had "improved" with regard to his first and four goals, and was "worse" with regard to his second and third goals. (Tr. 529).

On June 10, 2011, state agency psychologist, Dr. Francis Murphy, Ph.D., reviewed the record and issued an opinion. (Tr. 96). He opined that Plaintiff had mild restrictions in his activities of daily living, moderate restrictions in his ability to maintain social functioning and to maintain concentration, persistence or pace, and no episodes of decompensation. (Tr. 95). Dr. Murphy opined that Plaintiff's subjective complaints were only "partially credible" because he "lives in a house alone," completes his activities of daily living, has no history of inpatient psychiatric treatment, and receives outpatient treatment only "infrequently." (Tr. 96). Dr. Murphy had the records from Plaintiff's treatment at Berkshire, but no t the records from his treatment at Universal. (Tr. 94). Dr. Murphy opined that Plaintiff did not have a limitation in understanding and memory. (Tr. 98). He opined that Plaintiff was moderately limited in his ability to maintain attention and concentration for extended periods, complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a

consistent pace without an unreasonable number and length of rest periods. (Tr. 98). Dr. Murphy concluded that he had "an ability to engage in at least simple repetitive work activities." (Tr. 99).

On June 22, 2011, Plaintiff reported to his counselor at Universal that he had an "epiphany" about having a "new normal" and "accepting of who he is, letting go of past…self blame." (Tr. 517). He was now "more active, exercising, walking, pacing self (given physical pain)." (Tr. 517).

In June and July of 2011, Plaintiff's GAF at Berkshire increased to 51-60. (Tr. 389-90).

On July 6, 2011, Plaintiff reported to his counselor at Universal that he was angry about the incident at the pharmacy when they gave him the incorrect medications, requiring an emergency room visit. (Tr. 516). He also indicated that he had "many barriers (his health/disability) to ever having a new relationship with significant other." (Tr. 516). On August 24, 2011, Plaintiff reported that his "physical medical conditions create a daily burden, i.e., acute pain due to RSD…back problems, headaches, and then [mental health symptoms] as a result." (Tr. 514).

On September 7, 2011, Plaintiff's treatment plan at Universal was updated. (Tr. 528). Plaintiff had five goals: (1) "find and return to a life style that can be defined as normal and stable;" (2) "explore the origins and/or current drivers as to

what's behind not liking [himself];" (3) "actually care about life in general again;" (4) "resolve undue unreasonable plague of past and current guilt;" and (5) "find an alternative lifestyle/cause that can replace my career/life of past (losses)." (Tr. 528). Plaintiff had "improved" with regard to his first four goals, and was the "same" with regard to his fifth goal. (Tr. 528). A progress note from the same day indicates that Plaintiff discussed his family members' reactions to the loss of one of his pets, and was "resigned to how they have been in past and presently." (Tr. 513). On September 21, 2011, Plaintiff addressed "moving on beyond dysfunctional family." (Tr. 512).

On October 26, 2011, Plaintiff reported to his counselor at Universal that he was having trauma triggers from the pharmacy giving him the wrong medication with intrusive thoughts, acute nightmares, and difficulty sleeping. (Tr. 511). Notes also indicate that Plaintiff "disclosed (belated) that he went to Jersey Shore Hospital to be admitted [for one and half] days, due to taking too many pills….withheld this information from therapist when it happened." (Tr. 511).[4]

In November of 2011, Plaintiff reported to his psychiatrist at Berkshire that he had been more depressed daily for the past two weeks. (Tr. 429). He was staying in his house more and wanted to "hibernate." (Tr. 429). On November 30, 2011, Plaintiff reported to his counselor at Universal that his "physical condition

---

[4] The administrative transcript does not contain records from Jersey Shore Hospital that reference an overdose on medication.

[was] same-to-worse, constant pain, takes heavy [medications] daily to alleviate pain, restricts [his] daily activities." (Tr. 509). He reported that he did not "go anywhere or with anyone over holidays due to physical condition and pets" and he indicated that he could not pay for all of his medical bills given his shoulder surgery the previous year. (Tr. 509).

On January 3, 2012, Plaintiff's counselor at Universal observed that Plaintiff's "body movements (getting up out of chair, walking) indicated signs of pain which [was] confirmed by [Plaintiff] in session." (Tr. 507). Plaintiff was "emotionally distraught" due to issues with his landlord, being unable to contact his pain specialist in Baltimore, and because "dating women has been disastrous due to their own issues." (Tr. 507). Plaintiff's counselor focused on "mentor role that [Plaintiff] provides for college students/tenants through college fraternity." (Tr. 507).

On January 31, 2012, Plaintiff contacted Universal by phone, reporting that he needed an earlier appointment with his counselor because he was "having anxiety" and felt "like he [was] back to where he used to feel." (Tr. 501). When he was told that his counselor was out that week, he said "thanks" and hung up. (Tr. 501). The Universal employee called him back and asked if he was having suicidal thoughts, and he said "he thought about harming himself…last night but he

wouldn't do anything." (Tr. 501). Plaintiff was provided with the crisis line telephone number. (Tr. 502).

On February 1, 2012, Plaintiff again contacted Universal by phone. (Tr. 500). He reported that he had "memories of having uncle" in a room with him and that he has a history of "breaking bones to deal [with] this pain." (Tr. 500). Plaintiff's appointment was moved up to February 6, 2012, and he was instructed that if he needed to go to a doctor before that he could go to the emergency room. (Tr. 499). Plaintiff again threatened to break a bone, and the Universal employee offered to send him an ambulance. (Tr. 498). Plaintiff refused because he could not afford to go to the emergency room and also refused to go to a "charge hospital." (Tr. 498).

Later that day, Plaintiff presented to Lock Haven Hospital after injuring his hand when he slammed it with a hammer. (Tr. 406). He was given pain medication discharged home in satisfactory condition. (Tr. 406). On February 2, 2012, Plaintiff presented to the emergency room at Williamsport Regional Hospital to follow-up for his hand injury. (Tr. 415). Plaintiff answered "yes" to the question "have you recently felt down, depressed, or hopeless" and "do you have thoughts of harming or killing yourself," but said "no" to the question "are you here because you tried to hurt yourself" and "have you recently had thoughts about harming or hurting others?" (Tr. 415). Plaintiff was in acute distress, but his affect appeared

normal, his speech was normal, he was calm and cooperative, and he made good eye contact. (Tr. 416). Plaintiff explained that he "banged his hand…to release frustration." (Tr. 424). Nurses initiated "suicide precautions," removing his clothing and valuables, placing him in view of the nurses' station, and placing the bed at the lowest level. (Tr. 416). Nurses' notes indicate that Plaintiff was "inappropriate," his affect was "labile" and he "appear[ed] to be 'off' a little." (Tr. 417). Nurses' notes also indicate Plaintiff "removed his own sling, [he] requested slign in the first place." (Tr. 417). The next morning, Plaintiff was "anxious." (Tr. 418). He was "wororied that when he is admitted to behavioral health they will not be able to address his 'chronic pain' issue with medication…he is 'torn between being admitted and leaving.'" (Tr. 418). Physicians documented depression, anxiety, a "psych disorder," and post-traumatic stress disorder. (Tr. 422-24). Psychiatric examination indicated Plaintiff's mood was anxious and assessed to have a GAF of 50. (Tr. 427). However, Plaintiff denied suicidal thoughts and was discharged in improved and stable condition. (Tr. 418-19).

On February 6, 2012, Plaintiff followed-up with his counselor at Universal. (Tr. 504). He reported "past [two weeks] having nightmares about uncle being in his room at night when he was young teenager…had to call the crisis hotline, check self in to [three] different emergency rooms to seek help." (Tr. 504).

On February 18, 2012, Plaintiff followed-up at Berkshire Psychiatric. (Tr. 428). His appearance was neat, his concentration was normal, his eye contact was good, his speech and movement were normal, his affect was appropriate, and his thought process was logical. (Tr. 428). His mood was anxious and depressed, his insight and judgment were fair, and his reality testing and decision making capacity were intact. (Tr. 428).

On March 5, 2012, Plaintiff reported to his therapist at Universal that he was "much better (more active, getting out, had a date, plan to get back in gym) since started on Risperdal" and that he did not need to take as many pain medications. (Tr. 495). He discussed his past sexual victimization, indicated that his mother "finally admitted…on some level that it happened and she did not to protect [him]" and he indicated that he would "never forgive her." (Tr. 495).

## C. Function Report, Testimony, and Findings

On March 15, 2011, Plaintiff submitted a Function Report. (Tr. 225). He indicated that he lived in a house by himself. (Tr. 225). He reported that he feeds, washes, and lets his pets outside. (Tr. 226). He indicated that he has trouble sleeping due to pain. (Tr. 226). Plaintiff reported no problem with his personal care. (Tr. 226). He indicated that he cooks food in the microwave twice a day and can no longer cook "big meals." (Tr. 227). Plaintiff reported that he does his laundry and cleaning, and it takes an entire day. (Tr. 227). He indicated that he

goes outside three to four times a day, can drive a car, and can go out alone. (Tr. 228). Plaintiff reported that he shops in stores once a month for two to three hours. (Tr. 228). He indicated that memory problems cause him to sometimes forget to pay bills. (Tr. 229). Plaintiff reported that his hobbies were watching television and playing video games, but he used to play sports, lift weights, and do long distance running. (Tr. 229). He spends time with others via text message on a daily basis, and regularly goes to the gym "for rehab" and Walmart. (Tr. 229). He reported problems with lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair climbing, seeing, memory, completing tasks, concentration, and following instructions. (Tr. 230). He explained that he usually follows written instructions well but forgets spoken instructions. (Tr. 230). Plaintiff indicated that he gets along with authority figures "fine," has never been fired from a job due to problems getting along with other people, and handles changes in routine "fine." (Tr. 231). He reported that his post-traumatic stress disorder and anxiety impact his ability to handle stress. (Tr. 231). Plaintiff indicated that he uses a cane and brace when doing tasks that required extended time away from home. (Tr. 231). He reported that he has pain in his back and legs that never goes away. (Tr. 233). He reported that Percocet relieves his pain, but only 50% for three hours, and that he has gained weight as a result of his pain. (Tr. 234).

On June 7, 2012, Plaintiff appeared and testified at a hearing before the ALJ. (Tr. 11). Plaintiff testified that he was unable to work because he could not sit or stand for eight-hours a day. (Tr. 16). He testified that the impairments that would cause the "most difficulty" in working was pain in his bilateral knees and thighs. (Tr. 16). He testified that his RSD had caused nerve damage that resulted in a burning sensation. (Tr. 17). He explained that wearing pants bothered his legs, and that medications do not completly relieve the burning sensation. (Tr. 27). He testified that physical therapy would not help the nerve damage in his knees, which he had been told was "permanent." (Tr. 17). He testified that his implanted electronic spinal stimulator made it difficult to walk because his "legs are actually getting so much of a flow." (Tr. 18). He indicated that he uses the stimulator two or three times per week. (Tr. 32). He testified that he has difficulties with memory and headaches, possibly due to injuries from playing rugby in college. (Tr. 18). He testified that he had problems with balance, motor coordination, and short-term memory due to possible traumatic chronic encephalopathy. (Tr. 19). He reported that his doctors had restricted him from lifting more than ten pounds. (Tr. 22). He reported that his medications make him dizzy, tired, and impacts his memory. (Tr. 28). He testified that he has to take breaks and naps once or twice a day as a result. (Tr. 30). He reported that he can only sit for up to thirty minutes and stand for up to ten minutes. (Tr. 31). He testified that he uses a cane ten days out of a month.

(Tr. 32). He indicated that he has problems with vertigo that cause him to be lightheaded and need to sit down, along with tunnel vision. (Tr. 33). He reported that he gets headaches in the back of his head and that when "you get a migraine headache…you're done." (Tr. 35). He explained that they cause sweating, extreme pain, and being unable to open his eyes because "everything hurts to look at." (Tr. 36). He indicated that he could not perform his daily routine when he had migraines, and had to lie down in a cold, dark room. (Tr. 36).

He testified that his daily activities were "limited," as he "spen[t] a lot of time on the couch, waiting for [his] medication to...kick in." (Tr. 19). He explained that, if he "did something that day with people," it would "put a toll on [him] for the next day or two." (Tr. 19). He reported that there are "three, four days, sometimes five where [he is] pretty much watching TV, letting my dogs out of the house, doing that stuff. It's not enjoyable." (Tr. 19). He testified that he lives by himself and was able to get things done around the house, "but not the way you would normally get them done." (Tr. 20). He explained that he "cannot keep going at them because [he has] to stop all the time and sit back down or lay down." (Tr. 21). He reported that he is no longer able to do his hobbies of "athletics, sports, fitness training, running," so he reads books and fishes. (Tr. 21). He testified that he uses a cane and needs other people to walk his dogs. (Tr. 22). He admitted that his shoulder was "better than it was." (Tr. 24). He testified that, at the time of Dr.

Nielsen's examination, he had been out of surgery for only four months and was not able to lift weights at that time. (Tr. 26). He explained that he had to sleep sitting up for three months after his surgery. (Tr. 26).

A vocational expert also appeared and testified. (Tr. 44). He testified that, given the ALJ's RFC assessment described below, Plaintiff could perform other work in the national economy as an office clerk, a clerical sorter, or an appointment clerk. (Tr. 44). He testified that, if Plaintiff's testimony was fully credible and accepted, there would be no work in the national economy that Plaintiff could perform. (Tr. 44).

On August 2, 2012, the ALJ issued the decision. (Tr. 127). At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since June 20, 2010, the alleged onset date. (Tr. 127). At step two, the ALJ found that Plaintiff's RSD, depression, and degenerative joint disease of the right shoulder were medically determinable and severe. (Tr. 127). At step three, the ALJ found that Plaintiff did not meet or equal a Listing. (Tr. 128). The ALJ found that Plaintiff had the RFC to perform sedentary work, sitting for six hours during an eight-hour workday and standing for ten to fifteen minutes at a time, two to three hours cumulatively, with the opportunity to alternate sitting and standing at his discretion. (Tr. 129). Plaintiff was to avoid overhead work; climbing ladders, ropes, or scaffolds; and working with unprotected heights and dangerous

machinery. (Tr. 129). Plaintiff was limited to semi-skilled occupations with a specific vocational preparation ("SVP") level of three or less and must avoid occupations that require "constant interaction with coworkers, supervisors, or the public." (Tr. 129). At step four, the ALJ found that Plaintiff could not perform past relevant work. (Tr. 132). At step five, the ALJ found that Plaintiff could perform other work in the national economy as an office clerk and a clerical sorter. (Tr. 133). Consequently, the ALJ found that Plaintiff was not disabled and not entitled to benefits. (Tr. 133).

## VI.      Plaintiff Allegations of Error

### A.      Evaluation of Plaintiff's mental impairments

Plaintiff asserts that the ALJ failed to properly evaluate Plaintiff's mental impairments because he "oversimplified Plaintiff's mental functioning by finding [only] that the medical records establish a diagnosis of depression but clinical findings on mental status examination were essentially normal." (Pl. Brief at 10). Plaintiff asserts the  ALJ erred in concluding that "the record did not establish any worsening of Plaintiff's condition," citing Plaintiff's drop in GAF scores in 2006 to 41-50 in 2011 and 2012.  (Pl. Brief at 11). Defendant responds that GAF scores are not determinative of disability and Plaintiff "ignores the fact that his GAF score improved with treatment…[at] Plaintiff's last two visits in June and September of

2011, his GAF score assessment was increased to "51-60", indicating only moderate symptoms." (Def. Brief at 19).

> Defendant generally responds that:
>
> Even though Plaintiff's mental health treatment was conservative and minimal, the ALJ still gave him every benefit of the doubt and included non-exertional limitations in the RFC assessment that limited Plaintiff to only semi-skilled work without constant contact with coworkers, supervisors, or the public (Tr. 129).

(Def. Brief at 18). Defendant further responds that "the ALJ's decision is supported by the findings of the state agency mental health expert who opined that Plaintiff's mental impairments were not disabling." (Def. Brief at 20).

The ALJ evaluated Plaintiff's mental impairments at step two, step three, and in the RFC analysis. (Tr. 127-131). At step two, as discussed above, the ALJ only found Plaintiff's depression to be a severe impairment. (Tr. 127). At step three, the ALJ wrote that Plaintiff had a "mild restriction" in activities of daily living because he "reports no difficulties caring for his personal needs." (Tr. 128). The ALJ wrote that Plaintiff had "moderate difficulties" in social functioning because he "alleges difficulties with depression and anxiety, but reports no difficulties getting along with others and no difficulties with authority figures." (Tr. 128). The ALJ wrote that Plaintiff has "moderate difficulties" in concentration, persistence, and pace because he "alleges difficulties with memory and concentration but the clinical findings on mental status examination in the

treatment records discussed below do not support such difficulties....alleges no difficulties with changes in routine." (Tr. 128). The ALJ wrote that Plaintiff had no episodes of decompensation because he has no "inpatient hospitalizations or emergency room visits as a result of any mental condition." (Tr. 129).

In the RFC, the ALJ wrote only that:

> In terms of the claimant's alleged mental functional limitations, the treatment records establish a diagnosis of depression but the clinical findings on mental status examination are essentially normal. In March of 2011, the claimant's treating psychologist at Universal Behavioral Health documented normal remote and recent memory, normal immediate recall, and appropriate affect. In March of 2012, the claimant told his therapist that he was feeling much better. He stated that he was more active and that he doesn't need to take as much pain medication. He stated that he recently had a date.

(Tr. 131). The ALJ assigned "some weight" to the state agency psychologist opinion because it was consistent with the record and Plaintiff had shown "continued improvement" since it was issued in June of 2011.

The Court agrees that the ALJ oversimplified Plaintiff's mental health condition. The ALJ selectively cites evidence in favor of his decision and mischaracterizes the record with regard to Plaintiff's mental health impairment. The ALJ also fails to include limitations assessed by the state agency psychologist without providing an explanation for their rejection. Moreover, the ALJ assesses moderate limitations in concentration, persistence, and pace, but does not include any limitation related to concentration, persistence, or pace in the RFC assessment. The ALJ failed to elicit testimony from the VE regarding the Dictionary of

Occupational Titles ("DOT") number for the positions the VE cited, so the Court is unable to determine whether these errors were harmless.

The ALJ makes multiple factual mischaracterizations with regard to Plaintiff's mental health condition and treatment. First, the ALJ writes that Plaintiff has had no emergency room visits due to "any mental health condition." (Tr. 129). However, the record plainly documents that Plaintiff checked himself in to three different emergency rooms in early February of 2012 after having nightmares about sexual abuse at the hand of his uncle and slamming his hand with a hammer to relieve frustration. (Tr. 406-424, 504). The record also shows that Plaintiff was admitted to Jersey Shore Hospital for one and a half days after overdosing on medication. (Tr. 511). The ALJ did not attempt to obtain these records from Jersey Shore Hospital, although Plaintiff was not represented by an attorney at the hearing or at the time of the ALJ decision. As the Third Circuit has explained:

> An ALJ owes a duty to a *pro se* claimant to help him or her develop the administrative record. "When a claimant appears at a hearing without counsel, the ALJ must 'scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts.' " *Key v. Heckler,* 754 F.2d 1545, 1551 (9th Cir.1985) (quoting *Cox v. Califano,* 587 F.2d 988, 991 (9th Cir.1978)); *Dobrowolsky,* 606 F.2d at 407 (noting that an ALJ must "assume a more active role when the claimant is unrepresented"). *See generally Ventura v. Shalala,* 55 F.3d 900, 902 (3d Cir.1995) ("ALJs have a duty to develop a full and fair record in social security cases.").

*Reefer v. Barnhart*, 326 F.3d 376, 380 (3d Cir. 2003).

The ALJ also never mentions these emergency room visits. Thus, the ALJ's conclusion that Plaintiff had no "emergency room visits as a result of any mental condition" is a significant factual mischaracterization of the record that requires remand. *See Cotter v. Harris*, 642 F.2d 700, 707 (3d Cir. 1981) (The ALJ "misconstrued the evidence considered" so "his conclusion… must be reconsidered").

The emergency room visits in February of 2012 also demonstrate that Plaintiff had not shown "continued improvement" since June of 2011. At Plaintiff's assessment at Universal in March of 2011, Plaintiff indicated that he had not had thoughts of suicidal for three years. (Tr. 533). However, on January 31, 2012, Plaintiff contacted Universal by phone, reporting that he needed an earlier appointment with his counselor because he was "having anxiety" and felt "like he [was] back to where he used to feel." (Tr. 501). When he was told that his counselor was out that week, he said "thanks" and hung up. (Tr. 501). The Universal employee called him back and asked if he was having suicidal thoughts, and he said "he thought about harming himself…last night but he wouldn't do anything." (Tr. 501). Plaintiff was provided with the crisis line telephone number. (Tr. 502).  At his February 2, 2012 hospitalization, Plaintiff answered "yes" to the "do you have thoughts of harming or killing yourself?" (Tr. 415). This crisis and hospitalizations also provide context for the Plaintiff's report in March of 2012 that

he was "better," which was cited by the ALJ to conclude that he had demonstrated "continued improvement" since the state agency physician's opinion in June of 2011. (Tr. 131). The Court also notes that the state agency physician based his opinion on Plaintiff's "infrequent" outpatient treatment, but only had the records from Plaintiff's treatment at Berkshire, not the records from his treatment at Universal. (Tr. 94, 96).

Plaintiff's attendance at therapy at Universal also indicates that he had not shown "continued improvement" since June of 2011. From March through November of 2011, Plaintiff attended thirteen appointments, with only two appointments that he cancelled ahead of time. (Tr. 489). He did not show up for his appointment in December of 2011. (Tr. 489). From January of 2012 through May of 2012, he attended four appointments, cancelled four appointments, and did not show up for two appointments. (Tr. 488). Plaintiff was discharged on May 7, 2012. (Tr. 490-91).

Plaintiff's progress notes at Universal similarly contradict the ALJ's conclusion that Plaintiff had "continued improvement" since June of 2011. In November of 2011, Plaintiff reported to his psychiatrist at Berkshire that he had been more depressed daily for the past two weeks. (Tr. 429). He was staying in his house more and wanted to "hibernate." (Tr. 429). On November 30, 2011, Plaintiff reported to his counselor at Universal that his "physical condition [was] same-to-

worse, constant pain, takes heavy [medications] daily to alleviate pain, restricts [his] daily activities." (Tr. 509). He reported that he did not "go anywhere or with anyone over holidays due to physical condition and pets" and he indicated that he could not pay for all of his medical bills given his shoulder surgery the previous year. (Tr. 509). On January 3, 2012, Plaintiff's counselor at Universal observed that Plaintiff's "body movements (getting up out of chair, walking) indicated signs of pain which [was] confirmed by [Plaintiff] in session." (Tr. 507). Plaintiff was "emotionally distraught" due to issues with his landlord, being unable to contact his pain specialist in Baltimore, and because "dating women has been disastrous due to their own issues." (Tr. 507).

The ALJ also erred when he concluded that Plaintiff "reports no difficulties getting along with others and no difficulties with authority figures" and "reports no difficulties caring for his personal needs." (Tr. 128). With regard to getting along with others, Plaintiff referenced difficulty getting along with his family, paramours, students he mentored, parents of students he mentored, and supervisors to his counselor at Universal. On March 3, 2011, Plaintiff attributed his PTSD symptoms to a hostile work environment and problems with a "superintendent who fired nine administrators in one year." (Tr. 535). On September 7, 2011, Plaintiff reported a fraternity member "who tried to frame him." (Tr. 522). Plaintiff discussed his family members' reactions to the loss of one of his pets, and was

"resigned to how they have been in past and presently." (Tr. 513). On September 21, 2011, Plaintiff reported that the parents of one of the college students threatened to sue him for his involvement with the student's problems. (Tr. 521). Plaintiff also addressed "moving on beyond dysfunctional family." (Tr. 512). On January 3, 2012, Plaintiff reported that "dating women has been disastrous due to their own issues." (Tr. 507). On March 5, 2012, Plaintiff discussed his past sexual victimization, indicated that his mother "finally admitted…on some level that it happened and she did not to protect [him]" and he indicated that he would "never forgive her." (Tr. 495).

With regard to daily activities, Plaintiff reported several limitations. On November 30, 2011, Plaintiff reported to his counselor at Universal that his "physical condition [was] same-to-worse, constant pain, takes heavy [medications] daily to alleviate pain, restricts [his] daily activities." (Tr. 509). At the hearing in June of 2012, Plaintiff testified that his daily activities were "limited," as he "spen[t] a lot of time on the couch, waiting for [his] medication to...kick in." (Tr. 19). He explained that, if he "did something that day with people," it would "put a toll on [him] for the next day or two." (Tr. 19). He reported that there are "three, four days, sometimes five where [he is] pretty much watching TV, letting my dogs out of the house, doing that stuff. It's not enjoyable." (Tr. 19). He testified that he lives by himself and was able to get things done around the house, "but not the way

you would normally get them done." (Tr. 20). He explained that he "cannot keep going at them because [he has] to stop all the time and sit back down or lay down." (Tr. 21). The ALJ is not required to credit these reports, but the ALJ may not conclude that Plaintiff made no "reports" of difficulty interacting with others or completing his daily activities because that is a factual mischaracterization of the record.

The ALJ also did not mention that Dr. Murphy opined that Plaintiff was moderately limited in his ability to maintain attention and concentration for extended periods, complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. 98). Dr. Murphy also opined that Plaintiff had a moderate limitation in concentration, persistence, and pace. (Tr. 98). The Court notes that the ALJ assessed a moderate limitation in concentration, persistence, and pace. The Third Circuit has held that an RFC more restrictive than the RFC here did adequately account for moderate limitations in concentration, persistence, and pace. In *Ramirez v. Barnhart*, 372 F.3d 546 ( 3d Cir. 2004), the Court held that a limitation to simple one or two step tasks was not sufficiently specific to convey moderate limitations in concentration, persistence, and pace. *Id.* at 552; *cf. Burns v. Barnhart*, 312 F.3d 113, 123 (3d Cir. 2002) (Restriction to simple, repetitive, one and two-step tasks was insufficient to

account for limitations arising from borderline intellectual functioning). Here, Dr. Murphy specifically concluded that Plaintiff had "an ability to engage in at least simple repetitive work activities." (Tr. 99). However, the ALJ did not limit Plaintiff to simple repetitive work or otherwise incorporate these limitations into his RFC, other than limiting Plaintiff to semi-skilled work. (Tr. 129). As the Third Circuit has explained:

> [T]he Secretary must "explicitly" weigh all relevant, probative and available evidence. *Dobrowolsky v. Califano,* 606 F.2d 403, 407 (3d Cir.1979); *see also Brewster v. Heckler,* 786 F.2d 581, 584 (3d Cir.1986); *Cotter,* 642 F.2d at 705. The Secretary must provide some explanation for a rejection of probative evidence which would suggest a contrary disposition. *Brewster,* 786 F.2d at 585. The Secretary may properly accept some parts of the medical evidence and reject other parts, but she must consider all the evidence and give some reason for discounting the evidence she rejects. *Stewart v. Secretary of H.E.W.,* 714 F.2d 287, 290 (3d Cir.1983)

*Adorno v. Shalala*, 40 F.3d 43, 48 (3d Cir. 1994). Here, the ALJ has provided no reason for rejecting Dr. Murphy's limitation to simple, repetitive work or limitations related to concentration and pace. Consequently, the Court cannot meaningfully review whether his rejection of these limitations was supported by substantial evidence. *See Diaz v. Comm'r of Soc. Sec.*, 577 F.3d 500, 504-05 (3d Cir. 2009) ("The ALJ must provide a 'discussion of the evidence' and an 'explanation of reasoning' for his conclusion sufficient to enable meaningful judicial review") (quoting *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 120 (3d Cir. 2000).

Plaintiff properly asserted that the ALJ oversimplified his analysis of Plaintiff's mental impairments. The Court recommends remand for the ALJ to conduct an evaluation of Plaintiff's mental impairments sufficient to allow for meaningful judicial review. Because the Court recommends remand on this ground, the Court declines to address Plaintiff's other allegations of error.

## VII.    Conclusion

The undersigned recommends that the Court vacate the decision of the Commissioner pursuant to 42 U.S.C. § 405(g) and remand the case for further proceedings.

Accordingly, it is HEREBY RECOMMENDED:

1.    The decision of the Commissioner of Social Security denying Plaintiff's social security disability insurance and supplemental security income benefits be vacated and the case remanded to the Commissioner of Social Security to develop the record fully, conduct a new administrative hearing and appropriately evaluate the evidence.

2.    The Clerk of Court close this case.

The parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a Magistrate Judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the Magistrate Judge and all parties, written objections

which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A Judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The Judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

Dated: March 25, 2015                          s/Gerald B. Cohn
                                        GERALD B. COHN
                              UNITED STATES MAGISTRATE JUDGE